James RALSTON and Kirk S. Rado, individually, and on behalf of other persons similarly situated, Plaintiffs,

v.

Bradford G. CAPPER, Virginia B. Capper, Elizabeth Capper, individually; Alex Furda and Zoya Furda, individually and d/b/a Furda Bio-Chemical Biopsy; and Bradford G. Capper, D.O., P.C., a Michigan corporation, Defendants.

Civ. A. No. 82–74645.

United States District Court, E.D. Michigan, S.D.

Sept. 14, 1983.

Fieger, Fieger & Lamping, P.C. by William J. Lamping, Southfield, Mich., for plaintiffs.

Virginia B. Capper, in pro per.

Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C. by D.J. Watters, John P. Jacobs, Detroit, Mich., for defendants Bradford G. Capper and Bradford G. Capper, D.O., P.C.

Cass S. Jaros, Detroit, Mich., for defendants Alex and Zoya Furda, individually and d/b/a Furda Bio-Chemical Biopsy.

## OPINION

GILMORE, District Judge.

This action is brought under the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. 1961, *et seq.* ("RICO"). A civil remedy is provided in § 1964(c):

Any person injured in his business or property by reason of a violation of § 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Plaintiffs charge defendants with fraudulent, illegal and corrupt activities in providing medical treatment and related medical services to patients. Bradford Capper, D.O., was a medical practitioner who operated a "Suburban Clinic" in Livonia, Michigan. His sister, Virginia Capper, was the attorney and secretary for Bradford Capper, D.O., P.C. Elizabeth Capper, his wife,

was the Vice-President and Treasurer of the Corporation, and Alex Furda and his wife Zoya operated Furda Bio-Chemical Biopsy, a blood-testing service located in Lansing, Michigan.

Plaintiffs in the instant case are former patients who received medical services from defendants.[1] They allege they have been injured monetarily and otherwise by the fraudulent activities of defendants.

It is plaintiffs' allegation that they were victims of a Medicaid fraud scheme.[2] Plaintiffs allege that Dr. Capper, and those associated with him, billed them and Medicaid, as well as other insurance carriers, for work and tests that were never performed. They further allege that unnecessary tests were performed upon plaintiffs, inflicting physical and mental injury. The Furdas are alleged to have taken part in the scheme by performing unnecessary and fraudulent blood tests. Plaintiffs allege a scheme to defraud, and a conspiracy on the part of all defendants. In addition, they allege that defendants used the mails in furtherance of their scheme to defraud, in violation of 18 U.S.C. § 1341, the federal mail fraud statute. They further allege that each of the plaintiffs was injured in his or her business or property by reason of the acts and conduct of the defendants.

In their motions to dismiss, defendants essentially argue that, although their activities may literally fall within the words of the RICO Statute, they are not within its spirit or purpose. They argue that RICO was not intended to provide a federal treble-damage remedy for "garden variety" state fraud claims, and cite many U.S. district court cases which evince judicial hostility towards civil RICO claims.

RICO is part of Title IX of the Organized Crime Control Act of 1970, Public Law No. 91–452, 84 Stat. 922 (1970). In the statement of findings and purposes, the Statute states:

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

Section 1962(a)–(d) of RICO contains the prohibited activities which are made subject to criminal penalties under § 1963 and civil penalties under § 1964. Although the criminal penalties have been widely employed in the last decade and are subject to many appellate decisions, until very recently the civil penalties were rarely used and there is a relative scarcity of appellate opinions dealing with civil penalties under RICO.

Section 1961 of RICO supplies the definitions of the elements necessary to prove a § 1962(c) violation. A "pattern of racketeering activity" is defined in § 1961(5) as follows:

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

"Racketeering activity" is defined in Section 1961(1) as follows:

(1) "Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code, ... section 1341 (relating to mail fraud), ...

In the criminal context, the Sixth Circuit has defined the elements constituting a violation of § 1962(c) as: 1) engaging in an enterprise, 2) affecting interstate commerce, 3) conducted through a pattern of racketeering, and 4) involving two or more statutorily-named racketeering crimes. *United States v. Sutton,* 642 F.2d 1001, 1008 (6th Cir.1980) (en banc), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981). The conspiracy provision of § 1962(d) is a separate offense, and thus for criminal purposes is not violative of double jeopardy, since it involves proof of the additional element of an agreement to violate § 1962(c).

---

1. The complaint alleges that plaintiffs are bringing the case both individually and as part of a class of patients injured by the defendants, but, as of this date, no motion for class certification has been brought or granted. Thus, at this point, we are concerned only with allegations made by plaintiffs as individuals.

2. Although not part of the pleadings, and thus not directly relevant to the motion presently before the Court, the Court notes that this allegation is not fanciful—Dr. Capper pled guilty to Medicaid fraud in state court.

Many federal district courts have sustained a narrow reading of the RICO statute when civil penalties are at stake.[3] This Court finds no basis, however, for sustaining a narrow reading of the RICO statute when civil penalties are at stake, nor is there any basis for establishing additional court-imposed requirements for civil RICO violations in face of the clear language of the RICO statute. To put it simply, courts "are without authority to restrict the application of the statute" beyond its statutory language. *United States v. Turkette*, 452 U.S. 576, 587, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981). This position is not only clearly mandated by the Supreme Court's holding in *Turkette*, but it is also reflected in a growing number of appellate decisions that reject narrow readings of civil RICO suits. *See USACO Coal Company v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir.1982), upholding an injunction in a civil RICO action founded on the corporate promoter's breach of fiduciary duty.[4] *See also Bennett v. Berg*, 685 F.2d 1053 (8th Cir. 1982), *aff'd*, 710 F.2d 1361 (8th Cir.1983) (en banc), and *Schact v. Brown*, 711 F.2d 1343 (7th Cir.1983). This reasoning is also supported by the clear weight of recent commentary. *See* Tarlow, *RICO Revisited*, 17 *Georgia L.Rev.*, 291, 305 (1983); Strafer, Massumi & Skolnick, *Civil RICO in the Public Interest: "Everybody's Darling,"* 19 *Am. Crim.L.Rev.* 655 (1982); Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction*, 95 *Harv.L.Rev.* 1101 (1982).

Defendants contend that the RICO statute was not intended by Congress to reach "garden variety" fraud or mere medical malpractice, and that Congress did not intend for § 1964(c) to federalize already existing state common law remedies such as traditional common law fraud remedies. There is nothing in the plain language of RICO to support this contention. On the contrary, Title IX contains a clause stating: "The provisions of this title ... shall be liberally construed to effectuate its remedial purposes." The statement of findings and purpose of the statute speaks of "new remedies," clearly indicating an intent to add to already existing remedies.

*Schacht v. Brown*, 711 F.2d 1343 (7th Cir.1983) is the most recent appellate case dealing with RICO's civil damage provisions. There the Illinois State Director of Insurance brought an action to recover for alleged RICO violations by officers, directors, and the parent corporation, who allegedly continued an insurer in business past the point of insolvency and looted the insurer of its most profitable and least risky business. A motion to dismiss was denied in the trial court, and on interlocutory appeal the court of appeals held that the state director's RICO complaint sufficiently alleged a causal nexus between RICO proscribed conduct and insurer's damage to meet the requirements of RICO's civil damage provisions. The court dealt at length with the defendant's contention that the injury which the Director alleged was not compensable under the civil damage provisions of RICO, and rejected such argument. The main argument of the defendant was that, even though RICO might literally apply to its situation, Congress did not intend the statute to reach so far. The defendant argued, as the defendants have argued here, that it would be unreasonable to federalize the common law of "garden variety" business frauds.

The court rejected the argument:
We agree that the civil sanctions provided under RICO are dramatic, and will have a vast impact upon the federal-state division of substantive responsibility for redressing illegal conduct, but, like most courts who have considered this issue, we believe that such dramatic consequences are necessary incidents of the deliberately broad swath Congress chose to cut in order to reach the evil it sought; we are therefore without authority to restrict the application of the statute... (citations omitted).
*Id.* at 1353.

After a lengthy analysis, the court said this:

3. *See, e.g., Moss v. Morgan Stanley, Inc.*, 553 F.Supp. 1347 (S.D.N.Y.1983); *Harper v. New Japan Securities*, 545 F.Supp. 1002 (C.D.Cal. 1982); *Van Schaick v. Church of Scientology*, 535 F.Supp. 1125 (D.Mass.1982); *Adair v. Hunt International Resources Corp.*, 526 F.Supp. 736 (N.D.Ill.1981); *Waterman Steamship Corp. v. Avondale Shipyards*, 527 F.Supp. 256 (E.D.La. 1981); *North Barrington Development, Inc. v. Fanslow*, 547 F.Supp. 207 (N.D.Ill.1980). This includes cases in this district. *See, e.g., Barker v. Underwriters At Lloyd's, London*, 564 F.Supp. 352 (E.D.Mich.1983); *Landmark Savings & Loan v. Rhoades*, 527 F.Supp. 206 (E.D. Mich.1981).

4. That court noted that "Congress intended that RICO be liberally construed to effectuate its remedial purposes." 689 F.2d 95, n. 1.

In short, while we are mindful of the jurisprudential maxim that statutes are not to be interpreted woodenly and without regard to their aim, we do not see how any legitimate or principled tailoring of RICO could be effected without impairing the broad strategy embodied in the act. If Congress wishes to avoid the inclusion under RICO's umbrella of "garden variety" fraud claims involving the operation of enterprises through mail and securities fraud, it may easily do so through removing mail and securities fraud from the list of predicate acts enumerated in § 1961. That is not, however, a program which may be undertaken by this court....

*Id.* at 1356.

Defendants further point to the legislative history of RICO, which establishes that Congress was concerned with "organized crime," and enacted RICO as a weapon in the combat against organized crime, especially the infiltration of legitimate businesses by organized crime elements. No one can quarrel with this analysis of the legislative history. What one quarrels with is the conclusion, uniformly rejected in the criminal RICO case law, that, because of this, RICO is to be read as creating a "status" offense, limited to a judicially-created definition of what constitutes "organized crime." No court has accepted this analysis.

Criminal RICO decisions have uniformly held that RICO is not limited to a judicially-created definition of "organized crime." *United States v. Martino,* 648 F.2d 367 (5th Cir.1981); *United States v. Uni Oil, Inc.,* 646 F.2d 946 (5th Cir.1981); *United States v. Aleman,* 609 F.2d 298 (7th Cir.1979); *United States v. Forsythe,* 560 F.2d 1127 (3d Cir.1977). RICO criminal prosecutions have been upheld against members of the Hell's Angels Motorcycle Club, an attorney charged with investing money derived from a client's drug dealing, a large Japanese corporation, state legislators, union leaders, oil companies, and state prosecuting attorneys' offices. *See Tarlow, supra,* at 299–300, and cases cited therein. The Sixth Circuit has held that the office of the Governor of the State of Tennessee could be charged as a RICO "enterprise." *United States v. Thompson,* 685 F.2d 993 (6th Cir. 1982) (en banc), *cert. denied* —— U.S. ——, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982).

In the face of this overwhelming authority in the criminal context, there simply is no basis to conclude that civil RICO suits should be construed more narrowly.

There are good reasons for not reading into RICO a definition of "organized crime." First, Congress explicitly rejected an attempt to restrict the scope of RICO to "the Mafia" or "La Costra Nostra." This rejection was based on well-grounded fears of the unconstitutionality of the creation of a "status offense," which would limit the application of the statute to a specified group in society.

Secondly, Congress feared that a narrow definition of the groups Congress was trying to reach through RICO would unnecessarily limit the scope of the statute and weaken the ability of Congress to combat organized crime. *See* Note, *Civil RICO, supra,* at 1106–1109.

In light of all of this, it seems clear that RICO creates a functional offense rather than a status offense. It is aimed at conduct, and if the conduct meets the definitions provided in the statute, then the conduct is within the meaning of the statute. To hold otherwise would simply create too much judicial discretion in defining what constitutes "organized crime." Where the RICO statute itself defines the offense, there is no reason to allow courts to impose additional definitions according to their own conceptions of what "organized crime" is or is not.

Similarly, there is no basis in the statute itself, or in the legislative history, for concluding Congress could not have intended the civil RICO provisions to possibly intrude on areas of state law. The Supreme Court noted in *Turkette, supra:*

[T]he language of the statute and its legislative history indicate that Congress was well aware that it was entering a new domain of federal involvement through the enactment of this measure ... The view was that existing law, state and federal, was not adequate to address the problem, which was of national dimensions ... There is no argument that Congress acted beyond its power in so doing. That being the case, the courts are without authority to restrict the application of the statute.

Id. at 586–87, 101 S.Ct. at 2530–31.

Although *Turkette* was a criminal prosecution, there is nothing in the statute to indicate that this rationale should not apply to RICO civil remedies. Defendants

"floodgates" argument that federal courts will be overwhelmed with state "garden variety" fraud claims has no basis in fact. Nor is it true that a RICO "fraud" claim is identical to a state common law fraud claim. There must be an enterprise, there must be an effect upon interstate commerce before RICO can come into effect, and there must also be two predicate offenses. All of the separate elements of a 1962(c) or 1962(d) claim must be proven by plaintiffs, including the predicate racketeering acts, their impact on interstate commerce, and the existence of an enterprise. These requirements will be strictly adhered to.

An additional argument made by defendants, and accepted by some district courts, is that in order to establish standing to bring a claim under § 1964(c) plaintiffs must establish some kind of "competitive injury," *see North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207 (N.D.Ill.1980); "commercial harm," *Van Schaick v. Church of Scientology,* 535 F.Supp. 1125 (D.Mass.1982); or "racketeering enterprise injury", *Landmark Savings & Loan v. Rhoades,* 527 F.Supp. 206 (E.D. Mich.1981). This Court has great difficulty in understanding the precise meaning of these requirements, which are never defined, and even more difficulty finding a statutory source for these requirements.

■ These additional standing requirements appear to be based on a strained analogy to antitrust law, based upon references in RICO's legislative history to antitrust precedent, particularly as a basis for treble damage provisions. However, analogies to limitations on standing in the antitrust context are entirely inappropriate here. The antitrust laws are designed to promote competition in the marketplace, and courts have been concerned that the use of treble damage provisions in antitrust cases could threaten a company with economic ruin and thus reach a result contrary to the very purpose of the antitrust laws and reduce competition in the market place.

RICO has the opposite purpose. It is precisely designed to *ruin* those individuals and enterprises it is aimed at. It is not designed to increase their efficiency or pro-

tect them from insolvency. Thus, the rationale behind the antitrust standing concerns have no applicability here. *See Schact v. Brown, supra* at 1357–58.

■ Finally, given the ample record in the legislative history concerning Congress's recognition that the victims of organized crime extend to all social categories, including workers, consumers and the poor,[5] there is simply no basis for imposing a judicially-created standing requirement limiting recovery under § 1964(c) to businessmen, or those suffering from an undefined "racketeering enterprise" injury, since nothing in the statute or legislative history authorizes such a limitation. Obviously, there is no rationale for excluding Medicaid fraud victims from the scope of civil RICO.

Although § 1964(c) requires a specific violation of § 1962 in order to have a claim for civil relief, nowhere do plaintiffs plead a specific violation of § 1962. Liberally construing plaintiffs' claims, as the Court is required to do in considering a Rule 12(b)(6) motion, *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), it is clear that the violations of § 1962 most applicable to plaintiffs' claims are § 1962(c):

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

and § 1962(d), the RICO conspiracy provision:

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section. Added Pub.L. 91–452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 942.

Further, although plaintiffs plead a violation of 18 U.S.C. § 1341, mail fraud, in their complaint, the Court notes that they do not plead the two predicate acts within 10 years necessary to sustain a claim of "pattern of racketeering" activity under § 1961(5).

It is thus clear that there are some deficiencies in plaintiffs' pleadings. The Court

---

**5.** "Business competitors suffer unfair competition. Workers are the victim of sweetheart labor contracts. And consumers are victims of inferior products and services, price fixing and ... other predatory practices." 116 Cong.Rec. 35201 (Oct. 6, 1970, remarks of Rep. McCulloch). The President's Commission on Law En-

forcement also noted: "In all of these illicit operations the 'customers'—in reality the victims—are the people least able to afford criminal exploitation. They are the poor, the uneducated, and the culturally deprived...." 113 Con.Rec. 18004 (Report, "Organized Crime—Challenge to a Free Society").

has held it is without authority to narrow the application of § 1964(c) or impose additional requirements in face of the clear language of the statute. By the same token, this Court must insist that the statutory language be strictly adhered to. It necessarily follows that the Court must also insist that plaintiffs adhere to statutory requirements in pleading their claim.

■ The technical requirements for a RICO § 1964(c) claim must be strictly adhered to because the statute is a relatively specific one, designed to accomplish certain Congressional intent. In face of the difficulties courts have had in interpreting the provisions of RICO, and also in face of the treble damage liability which defendants are subject to, it is imperative that the court and the defendants be placed on clear notice as to what is being alleged, and what the substance of the claim is, in order to facilitate a decision on the merits of the case. It is also in keeping with the policies of the Federal Rules of Civil Procedure where allegations of fraud are involved. *See* F.R.C.P. 9(b) (allegations of fraud to be stated with particularity).

■ As noted earlier, there are several deficiencies in plaintiffs' complaint. Although § 1964(c) requires a specific violation of § 1962 in order to bring a claim for civil relief, plaintiffs have not pled any specific violation of § 1962. Defendants are clearly entitled to have notice of which specific provisions of § 1962 plaintiffs are relying on. If plaintiffs are also relying on a conspiracy theory, in addition to a substantive violation, this must be pled separately as well.

Looking further at the test for a § 1962 violation established in *United States v. Sutton, supra,* the plaintiffs have not pled a "pattern of racketeering activity" which must consist of two or more predicate acts within the last 10 years. Defendants have an absolute right to know which predicate acts plaintiffs rely upon that they must defend against. In addition, plaintiffs must plead an effect on interstate commerce under § 1962(c).

Finally, plaintiffs have not pled an "enterprise" within the meaning of § 1961(4), a required element in a § 1964(c) claim. Defendants are entitled to have notice of the type of "enterprise" that they as "persons" were "employed by" or "associated with". The plaintiffs' complaint does not give them that notice.

F.R.C.P. 15(a) declares that leave to amend "shall be freely given when justice so requires." The purpose of pleading is to facilitate a decision on the merits of a lawsuit. There will be no substantial prejudice to defendants if plaintiffs are granted a reasonable time to amend their complaint to comply with the RICO statute and the views expressed in this opinion.

The Court will give plaintiffs 30 days from the date of this opinion to amend its complaint. If the complaint is not amended within that time, defendants' motion to dismiss will be granted. If the complaint is amended by that time, defendants will have 30 days to raise any questions about the sufficiency of the complaint by motion. If such amended complaint is filed and defendants do not raise the questions as to the sufficiency of the amendment within 30 days, defendants' motion to dismiss will be denied. If defendants raise questions of the sufficiency of the amended complaint, the matter will be noticed on for hearing before the Court to determine if the amended pleading does comply with the requirements of RICO.

An order in accordance with this opinion may be presented.