**Lyn BENNETT, et al., Plaintiffs,**

v.

**E.F. HUTTON COMPANY, INC., Defendant.**

Civ. A. No. C83–1502A.

United States District Court, N.D. Ohio, E.D.

Nov. 28, 1984.

---

Carl M. Layman, III, Martin, Stimler, Layman & Stamm, Stow, Ohio, Jerry E. Kugelman, Cleveland, Ohio, for plaintiffs.

Robert N. Rapp, Mitchell G. Blair, Calfee, Halter & Griswold, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This commercial litigation, rooted in criminal commodity fraud and grand theft committed by an individual who is not a party to this case, is before this Court for a ruling on defendant E.F. Hutton Company, Inc.'s ("Hutton") motion to dismiss portions of the plaintiffs' second amended complaint. For the reasons set forth below, this Court dismisses all claims brought under the Commodity Exchange Act of 1936, as amended ("CEA" or "Commodity Act"), 7 U.S.C. §§ 1–26, and the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961–68. The remainder of the motion to dismiss is denied.

Jurisdiction is invoked under the CEA and RICO private right of action provisions, 7 U.S.C. § 25 and 18 U.S.C. § 1964(c) respectively, and three other federal question and diversity jurisdiction provisions, 28 U.S.C. §§ 1331, 1332, and 1337.

## I. PRIOR OPINION AND FACTUAL BACKGROUND

The factual history of this action is summarized in this Court's Memorandum and Order of July 11, 1984 ("Memorandum and Order"). In that opinion, this Court dismissed those claims in plaintiffs' first amended complaint which arose under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a et seq., and the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq., after concluding that the CEA provided the exclusive remedy for all causes of action relating to commodities futures. It then ordered the plaintiffs to file a second amended complaint, and directed the parties to submit pleadings discussing whether plaintiffs possess a cause of action under *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), which governs private actions under the CEA arising prior to January 11, 1983,[1] and under RICO.

Like the prior complaints, the second amended complaint states that from 1977 until 1982 Thomas L. Troyer managed an entity known as Commodity Concepts Managed Commodity Fund ("Commodity Concepts" or "the Fund"). Troyer solicited funds from investors, deposited them in a pooled account at Hutton's Akron, Ohio office, and contracted to buy and sell commodities for future delivery. Troyer violated the investment agreements and embezzled the funds. He later pleaded guilty to grand theft and to criminal violations of the Commodity Act. In a civil action, he consented to a permanent injunction ordering him and Commodity Concepts to dis-

---

1. In *Curran* and three companion cases, the Court held that private parties could bring actions for monetary damages based on certain specified sections of the CEA. Later in 1982, Congress created an express right of action under the statute, 7 U.S.C. § 25. The provision applied only "to causes of action accruing on or after the date of the enactment of the Futures Trading Act of 1983 [January 11, 1983]," but left intact "any right of any parties which may exist with respect to causes of action accruing prior to such date." It is not disputed that plaintiffs' alleged causes of action accrued prior to 1983. *See* Memorandum and Order at 6–9.

gorge their ill-gotten funds to an equity receiver.

The second amended complaint is brought by plaintiffs who purchased from one to almost eighty-five "units" in Commodity Concepts at a price of $1,000 per unit. Although not a Hutton employee, Troyer was provided with "office space, a desk, a computer terminal, direct telephone lines to the Chicago Board of Trade, and other office facilities customary in the commodities, and/or securities business." Troyer used the office daily until early 1982. Paragraphs 13–16 set forth the following additional factual allegations concerning the relationship between Troyer and Hutton:

13. By providing Lyn Troyer with the aforementioned office facilities, the Defendant made an implied representation to the Plaintiffs that Troyer was employed by or was an agent of the Defendant and rendered Troyer's statements to that effect credible. The Plaintiffs had little experience or sophistication in investment. They reasonably relied upon the implied representation made by the Defendant and upon the express representations of Troyer, and they reasonably believed that Troyer was employed by or was an agent of the Defendant, and that he was knowledgeable on the subject of investing in commodities. The Plaintiffs provided Troyer with funds to invest on their behalf in justifiable reliance upon such belief.

14. The Defendant, and Defendant's agents, had actual knowledge, or in the exercise of reasonable care should have known, that Lyn Troyer was unemployed and that he was not investing his own money, but was instead investing other people's money.

15. The Defendant, and Defendant's agents, further had actual knowledge that Lyn Troyer was incurring large losses on the commodities transactions which he made through the use of Defendant's facilities.

16. The Defendant profited from Troyer's fraudulent activities through the receipt of brokerage commissions on the transactions which Troyer executed through the use of the Defendant's facilities.

Counts 41 and 42 further allege that the investment agreements provided that Troyer would invest plaintiffs' funds in commodities futures, would return all funds to them if the Fund were discontinued, and would provide monthly account statements. Troyer "did not intend to, and did not," carry out the agreements, and instead "embezzled the Plaintiffs' funds and either converted them to his own use or used them to pay others what they expected as their own earnings." The plaintiffs never recovered the funds they invested.

Count One alleges that Hutton or its agents "aided and abetted" Troyer in defrauding the plaintiffs, in violation of 7 U.S.C. §§ 6b and 13c. Count Two alleges that Hutton "bestowed upon Troyer the apparent or ostensible authority of one of its agents or employees" and is subject to *respondeat superior* liability for his violations of 7 U.S.C. §§ 6b and 6d. Count Three states that by willfully aiding and abetting Troyer, Hutton violated 7 U.S.C. § 25. Count Four, which does not resemble any count in the earlier complaints, states that Hutton knew or should have known that Troyer was not a registered futures commission merchant or introducing broker, or an associate of one, and therefore that it aided and abetted Troyer's violation of 7 U.S.C. §§ 6d and 6k. Count Five repeats the same charge with respect to Troyer's actions as a commodity pool operator, alleging a violation of 7 U.S.C. § 6k. Count Six repeats Count Five and alleges a violation of 7 U.S.C. § 6o. Count Seven claims that the failure of Hutton, a commission registrant, "to diligently investigate, inquire, or supervise the handling of Troyer's commodity account" violated 17 C.F.R. § 166.3. Count Eight, brought pursuant to RICO, alleges that Troyer's activity was a fraud in the sale of securities, that Troyer's use of commodity wires constituted wire fraud and his use of the mails constituted mail fraud, and that Hutton's

"fraudulent activities and participation in the fraudulent activities of Troyer" constitute acts of racketeering and a pattern of racketeering. Count Nine, styled *"Respondeat Superior*—Common Law," repeats the earlier allegations that Troyer was Hutton's agent or employee and that Hutton is therefore liable for plaintiff's losses. And Count Ten alleges that Hutton committed common law fraud.

The plaintiffs seek compensatory damages in the amount of their lost investments, plus treble damages under RICO, $500,000 in punitive damages under Count Ten, interest from the date of investment, and other costs and fees.

## II. COMMODITY ACT CLAIMS

Hutton contends that the CEA claims of the second amended complaint fall into three categories: (1) the *respondeat superior* claim of Count Two, under 7 U.S.C. §§ 4, 6b and 6d; (2) the "aiding and abetting" claims of Count One, under 7 U.S.C. §§ 6b and 13c, Count Three, under 7 U.S.C. § 25, Count Four, under 7 U.S.C. §§ 6d and 6k, Count Five, under 7 U.S.C. § 6k, and Count Six, under 7 U.S.C. § 6*o*; and (3) the "failure to supervise" claim of Count Seven, under 17 C.F.R. § 166.3. Plaintiffs largely accept this categorization of their pleading, but maintain that Counts Five and Six also involve Hutton's liability for failure to use reasonable care.

### A. *Respondeat Superior*

■ Initially, Hutton argues that nothing in 7 U.S.C. §§ 4, 6b and 6d provides any basis for *respondeat superior* liability. In particular, § 4 states:

For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

Section 6b prohibits certain actions by "any member of a contract market, or ... any correspondent, agent, or employee of any member" or by "any person, in or in connection with any order"; § 6d imposes additional substantive requirements and prohibitions on persons, including certain corporate entities.

The crux of Count Two is that Hutton "bestowed upon Troyer the apparent or ostensible authority of one of its agents or employees." But, while § 4 attributes to commodity-trading entities acts by "any official, agent or other persons acting for [them]," such liability is limited to acts "within the scope of his employment or office...." Consequently, it would appear to violate the explicit parameters of the statute to deem an "apparent agent", who was neither an employee nor an officer, to be Hutton's actor for purposes of § 4. Moreover, since the reference to "this chapter" in § 4 refers to Chapter 1 of the CEA, 7 U.S.C. §§ 1 *et seq.*, this Court must apply the same standard to the reference to "correspondent, agent or employee" in § 6b and "person" in § 6d. Accordingly, concluding that there is no sweeping *respondeat superior* liability in the CEA superceding the explicit terms of § 4, this Court dismisses Count Two of the complaint.

### B. *Aiding and Abetting*

#### 1. 7 U.S.C. § 25

■ The various aiding and abetting allegations pose more difficult problems. One of them, however, is less vexing than the others. Count Three alleges that Hutton's conduct violated 7 U.S.C. § 25. As noted earlier, *supra* note 1, § 25 creates an express right of action concerning activities on or after January 11, 1983, leaving intact *Curran* actions for earlier violations of the statute. Since plaintiffs' alleged causes of action all arose prior to 1983, and since Count Three refers not to any preexisting right but only to express rights allegedly created by § 25 itself, simple logic dictates that Count Three fails to state a claim and must be dismissed.

2. 7 U.S.C. § 13c(a)

■ The 1982 amendments to the CEA not only added the express right of action under § 25 but also created a private right of action for aiding and abetting violations under 7 U.S.C. § 13c. Effective on January 11, 1983, the amended § 13c provides:

(a) Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

(b) Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

* * * * * *

The amendments significantly change the law of aiding and abetting under the CEA. The prior version of § 13c(a) explicitly provided that violators of rules, regulations, and orders could only "be held responsible in administrative proceedings"; § 13c(b) has no counterpart at all in the earlier statute.

Plaintiffs urge this Court to apply the amended § 13c retroactively to permit private actions for aiding and abetting violations occurring prior to 1983. They rely on the absence from the amended § 13c of a provision, like that found in § 25, limiting its effect to causes of action accruing on or after January 11, 1983. This argument ignores the difference between amending an existing statute and enacting a new one; it also contradicts established principles of statutory construction. A statute which creates a new right is deemed substantive and is applied prospectively unless its language evidences a legislative intent that it be applied retroactively. *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *United States v. Heth,* 7 U.S. (3 Cranch) 399, 2 L.Ed. 479 (1806); *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1306–07 (N.D.Ohio 1983); J. Sutherland, *Statutes and Statutory Construction* § 41.04 (4th ed. 1975). No evidence of Congressional intent that the amended § 13c apply retroactively is cited. In its absence, all claims under the statute must fail.

It follows that aiding and abetting claims under the other portions of the CEA must fail as well. To recognize a private right of action for aiding and abetting under §§ 6b, 6d, 6k, or 6o would create a direct contradiction between those provisions and the pre-1983 § 13c(a), which permitted prosecution of aiding and abetting violations only in administrative proceedings. In interpreting a statute, absurd results— such as creating by judicial fiat an internal inconsistency which otherwise does not exist in a statute—are to be avoided. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). The court in *Johnson v. Chilcott,* 590 F.Supp. 204 (D.Colo.1984), recognized just this point, and reached the sensible conclusion that no private right of action exists for any aiding and abetting violation occurring prior to the effective date of the amended § 13c(a). The opinion states:

... In [the prior version of] § 13c(a) Congress clearly indicated its intent that there be no private judicial remedy for aiding and abetting violations of any CEA provision. Section 13c(a) states that "[a]ny person who ... aids ... [and] abets ... a violation of any of the provisions of *this Act* ... may be responsible

in administrative proceedings ... as a principal." (Emphasis added).

... [N]o federal court, before the 1974 amendments, had ever found a private judicial remedy for aiding and abetting liability. Despite the state of the law in 1974, Congress chose *not* to remove the administrative remedy language from § 13c(a). Not surprisingly, no court after the 1974 amendments found a private judicial remedy for aiding and abetting liability. Only since 1983, when Congress removed the express limitation of remedy, has there existed a private judicial remedy for aiding and abetting CEA violations. The inquiry whether Congress intended to imply, in §§ 4b and 4o, private rights of action for aiding and abetting is abbreviated by the express limitation of remedy found in § 13c(a).

"[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' " *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19–20, 100 S.Ct. 242, 246–247, 62 L.Ed.2d 146 (1979); *Strax v. Commodity Exchange, Inc.*, 524 F.Supp. 936, 944 (S.D.N.Y.1981).

To infer a private remedy for aiding and abetting in the face of the § 13c(a) limitation would require evading rather than following the intent of Congress.

I conclude that the plaintiff has no private judicial remedy for aiding and abetting violations of the CEA.

*Id.* at 207 (emphasis in original) (footnote omitted).

Counts One and Four, which rely solely on an untenable theory of aiding and abetting, are dismissed.

## C. *Failure to Use Reasonable Care*

■ Plaintiffs argue, in the alternative, that Counts Five and Six allege more than mere aiding and abetting. Count Five alleges that Hutton "knew or through the use of reasonable care should have known that Troyer was soliciting funds for participation in a commodity pool," in violation of 7 U.S.C. §§ 6d and 6k. Count Six states that Hutton "knew, or in the use of reasonable care should have known that Troyer's activities were part of a device, scheme, or artifice to defraud the Plaintiffs," in violation of § 6o. Prior cases have held that private causes of action exist for violations of §§ 6d and 6o, *see, e.g., Hofmayer v. Dean Witter & Co., Inc.*, 459 F.Supp. 733 (N.D.Cal.1978), and do not exist for violations of § 6k. *J.E. Hoetger & Co. v. Asencio*, 558 F.Supp. 1361 (E.D.Mich.1983). But even with respect to §§ 6d and 6o, plaintiffs in their numerous memoranda fail to allege that Hutton was itself, or employed, an unregistered futures commission merchant or introducing broker within the meaning of § 6d, or itself committed fraud within the meaning of § 6o. Rather, they seek to impute Troyer's liability to Hutton, without suggesting a theory other than *respondeat superior* or aiding and abetting by which this could be done.

Accordingly, Counts Five and Six are dismissed.

## D. *Failure to Supervise*

■ Count Seven is the plaintiffs' "failure to supervise" claim, which alleges that Hutton, a commission registrant, "failed to supervise the activities of its employees or agents in connection with Troyer's fraudulent activities despite [its] knowledge that Troyer was trading others' money in commodities futures." The regulation they rely upon, 17 C.F.R. § 166.3, states in part:

Each Commission registrant ... must diligently supervise the handling of all commodity interest accounts carried, operated, or advised by the registrant and all other activities of its partners, officers, employees and agents ... relating to its business as a Commission registrant.

Hutton asserts that § 166.3 is merely a CFTC regulation which could not give rise to an express or implied private right of

action; the plaintiffs argue that the regulation should be analogized to regulations under the Exchange Act, such as Rule 10b–5, which do generate private lawsuits. While plaintiffs' argument properly rebuts Hutton's overly broad contention, it ignores the restrictions imposed by *Curran* on private actions under the CEA. In *Curran*, the Court found that, in amending the CEA in 1974, Congress intended to preserve a preexisting private right of action under certain CEA provisions. No such history accompanies § 166.3. As one court has written, "it is altogether clear from the releases accompanying the proposal and later adoption of § 166.3 that its purpose is to insure that *employees* are properly supervised, not to impose a general duty to police the trading in every account ... 'The basic purpose of [§ 166.3] is to protect customers by ensuring that their dealings with the *employees* of Commission registrants will be reviewed by *other* officials in the firm.'" *Sherman v. Sokoloff*, 570 F.Supp. 1266, 1271 (S.D.N.Y.1983) (quoting CFTC Notice (7/19/78) [1977–1980 Trans. Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,642 at 22,624) (emphasis in opinion). Consequently, this Court holds that § 166.3 does not provide a cause of action against a company for the alleged failure of its employees to prevent a non-employee from committing commodity fraud. Count Seven, the last of plaintiffs' claims under the CEA, is dismissed, and this Court turns to their RICO claims.

## III. RICO CLAIMS

Count Eight of the second amended complaint is based on RICO. The allegation states:

93. The Plaintiffs reallege all of the preceding allegations of this Complaint.

94. ... Hutton and ... Troyer, were associated in fact for the common purpose of transacting business in security and/or commodity investments.

95. ... Hutton and Troyer were also associated in an enterprise established for the purpose of defrauding the Plaintiffs through commodity investments.

96. ... Hutton and ... Troyer's association was an "enterprise" as defined in 18 U.S.C. Section 1961(4).

97. ... Hutton is a "person" pursuant to 18 U.S.G. Section 1961(3).

98. ... Hutton's activities affect interstate commerce.

99. Defendant allowed Troyer to use a telephone and instrumentalities of the commodity business to commit fraud.

100. The pooled investments of the Plaintiff's [sic] constitute a security within the meaning of the Securities Act, and the Exchange Act.

101. The scheme to defraud the Plaintiffs was a fraud in the sale of securities.

102. The use of the commodity wires constitutes wire fraud.

103. The use of the mails to deliver false reports constitutes mail fraud.

104. The Defendant's fraudulent activities and participation in the fraudulent activities of Troyer constitute at least two of the enumerated acts of racketeering activity as set out in 18 U.S.C. Section 1961(a).

105. Defendant has conducted its enterprise's affairs pursuant to a "pattern of racketeering activity," 18 U.S.C. Section 1961(5).

106. Defendant had knowledge concerning Troyer's scheme to defraud the Plaintiffs.

107. Defendant conspired to violate 18 U.S.C. Section 1962(c).

108. Because of the Defendant's fraudulent activities, and its participation in the fraudulent activities of Troyer, the Plaintiffs suffered severe financial losses and were, therefore, injured in their property by reason of the Defendant's violation of Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. Section 1962(c).

Plaintiffs invoke RICO's private right of action provision, 18 U.S.C. § 1964(c),[2] and

---

**2.** Title 18 U.S.C. § 1964(c) states:

Any person injured in his business or property by reason of a violation of section 1962

allege a violation of § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Hutton contends that the plaintiffs have failed to allege the predicate acts necessary to sustain a RICO claim, have failed to plead with sufficient particularity, and have not alleged a racketeering injury different in kind from the injury occurring because of the predicate acts. This Court turns first to Hutton's first and third arguments, both of which involve the hotly-disputed questions of what constitutes a "predicate act" and "racketeering injury."

## A. The Statute and the Second Circuit Opinions

Title 18 U.S.C. § 1961, the introductory section of RICO, defines the elements necessary to prove a violation of § 1962(c). Section 1961(5) defines a "pattern of racketeering activity" as follows:

> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity ...

Section 1961(1), as applicable to this case, defines "racketeering activity" in this manner:

> (1) "racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargea-

ble under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ... or (D) any offense involving ... fraud in the sale of securities....

Hutton's arguments rest on the extraordinary trilogy of civil RICO cases decided this summer by the Second Circuit Court of Appeals: *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, (2d Cir.1984); *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2d Cir.1984); and *Furman v. Cirrito*, 741 F.2d 524 (2d Cir.1984). Representing the most severe judicial limitation of RICO since the statute's enactment in 1970, the three opinions [3] impose two significant new requirements on plaintiffs in civil RICO actions: a "standing" requirement and a "prior criminal conviction" requirement.

In *Sedima*, Judge Oakes derived a standing requirement from language in § 1964(c) permitting suits by any person injured "by reason of a violation of section 1962 ..." Concluding that Congress intended to impose limitations similar to those applicable to another statute containing "by reason of" language, section 4 of the Clayton Act, 15 U.S.C. § 15, he wrote:

> The question then becomes what kind of injury is a "racketeering injury"? ... RICO was not enacted merely because criminals break laws, but because mobsters, either through the infiltration of legitimate enterprises or through the activities of illegitimate enterprises, cause systematic harm to competition and the market, and thereby injure investors and competitors. It was to help solve this problem that Congress added RICO to the arsenal of weapons used to fight organized crime. It is only when injury

---

of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**3.** *Sedima* and *Bankers Trust* were decided by divided panels, with Judge Cardamone dissenting in both cases. In *Furman* the entire panel disagreed with the result it found to be dictated by the previous two opinions.

caused by this kind of harm can be shown, therefore, that Congress intended that standing to sue civilly should be granted.

... For purposes of clarity, it is better to identify the RICO standing requirement as a "racketeering injury" requirement rather than a "competitive injury" requirement ... [T]he plaintiff [must] show injury different in kind from that occurring as a result of the predicate acts themselves, or not simply caused by the predicate acts, but also caused by an activity which RICO was designed to deter.

741 F.2d at 495–96.

The "prior criminal conviction" requirement was fashioned from a detailed analysis of the statutory language and legislative history. Summarized briefly, the court's position was that since "RICO liability simply does not exist without criminal conduct," civil RICO actions must still incorporate elements of the criminal burden of proof. "We conclude that had Congress considered this problem, it would have explicitly required previously established convictions in the context of section 1964(c)." *Id.* at 501. The court continued:

... [The legislative] history indicates that Congress assumed a preponderance standard was appropriate. The most logical conclusion to be drawn is that Congress expected the criminality of the predicate acts to be proved before the private action went forward—that a criminal conviction must precede a civil suit.

\* \* \* \* \* \*

... To bring a private civil action there must be a "violation," that is, criminal convictions on the underlying predicate offenses.

*Id.* at 502–03 (footnote omitted).

While formulating this requirement, Judge Oakes was critical of opinions and commentaries which declined to hold that a prior criminal conviction is a prerequisite to a civil RICO action. In particular, he characterized as "misguided" the view expressed by the Sixth Circuit in *USACO*

*Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir.1982). *See* 741 F.2d at 497. The *USACO* court stated in a footnote:

... Section 1964(c) states that an action for damages may be maintained by any person injured in his business or property by reason of a violation of § 1962. *Bennett v. Berg*, 685 F.2d 1053 (8th Cir. 1982). Section 1962 merely describes acts that are "unlawful" under RICO. Section 1963 provides that violations of § 1962 are criminal, just as § 1964(c) provides that violations of § 1962 create a private right of action for damages. If Congress had intended to limit liability under § 1964(c) only to those convicted of or charged with RICO crimes, it would have done so within § 1964(c) by referring to § 1963 or by otherwise specifically indicating that conviction under § 1963 is a basis for civil damages. By referring in § 1964(c) only to the unlawful acts of § 1962, Congress has created a civil remedy that is independent of criminal proceedings under § 1963....

689 F.2d at 95 n. 1.

The plaintiffs respond by challenging the relevance and applicability of *Sedima* and the other two Second Circuit cases and by stating that they have alleged predicate acts sufficient to enable them to proceed under RICO.

### B. *Governing Law in the Sixth Circuit*

#### 1. Prior Criminal Convictions

 Dealing with the two *Sedima* requirements in reverse order, this Court notes first that, whatever the merits of Judge Oakes' elegant analysis of RICO and his objections to *USACO*, that case is the law of this circuit and binds district courts in Michigan, Ohio, Kentucky and Tennessee. Those courts have consistently, and often enthusiastically, followed *USACO* and rejected arguments, like those adopted in *Sedima*, that the federal judiciary should take it upon itself to narrow a statute that Congress intended to "be liberally construed to effectuate its remedial purpose." *Austin v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 570 F.Supp. 667 (W.D.Mich. 1983); *see Ralston v. Capper*, 569 F.Supp. 1575 (E.D.Mich.1983); *Barker v. Underwriters at Lloyd's, London*, 564 F.Supp. 352 (E.D.Mich.1983). The Seventh Circuit has explicitly adopted the *USACO* formulation on civil RICO, *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1287 (7th Cir.1983), and a pre-*Sedima* Second Circuit panel cited the case without disapproval. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 19 n. 15 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1983). *See also Schact v. Brown*, 711 F.2d 1343 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *aff'd*, 710 F.2d 1361 (8th Cir.1983) (en banc); *cf. Owl Construction Co., Inc. v. Ronald Adams Contractor, Inc.*, 727 F.2d 540 (5th Cir.1984).

Quite simply, under *USACO* this Court cannot hold that a prior criminal conviction of Hutton is a prerequisite to a civil RICO action.

### 2. Standing

Anticipating this conclusion, Hutton argues in the alternative that nothing in *USACO* bars this Court from adopting the standing requirement propounded in *Sedima*. It urges dismissal of the RICO claims of the second amended complaint for failure to allege an injury separate and apart from that which would result directly from the alleged predicate acts. The argument fails to convince.

While the Sixth Circuit has not addressed the question of RICO standing, in *USACO* or elsewhere, imposition of the *Sedima* "racketeering injury" requirement to the facts of this case would be inconsistent with the Sixth Circuit's overall approach to RICO. The *USACO* panel, in rejecting arguments that it read § 1964(c) narrowly, concluded that its broad and "literal reading" of RICO is consistent with the approach of *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 ... (1981), and the Supreme Court's recognition in that case that Congress intended

that RICO be liberally construed to effectuate its remedial purposes." 689 F.2d at 95 n. 1. In *Sedima*, however, the court was unable to find "the 'liberal construction' language in *Turkette* ... particularly helpful in analyzing this problem" and explicitly rejected *USACO*'s reading of *Turkette*. 741 F.2d at 497 n. 42. It also criticized academic commentary that urged judicial deference to the sweeping Congressional language. *See Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies*, 53 Temp.L.Q. 1009 (1980), and Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction*, 95 Harv.L.Rev. 1101 (1982).

In short, *USACO* and *Sedima* represent diametrically opposite interpretations of RICO. It is for the Supreme Court, not this Court, to reconcile them. Engrafting *Sedima*'s standing requirement onto *USACO* would create an ungainly, and intellectually inconsistent, doctrinal tangle. Rather, under the liberal reading of RICO required in this circuit,

... there is simply no basis for imposing a judicially-created standing requirement limiting recovery under § 1964(c) to businessmen, or those suffering from an undefined "racketeering enterprise" injury, since nothing in the statute or legislative history authorizes such a limitation.

*Ralston v. Capper*, 569 F.Supp. at 1580.

### C. The "Enterprise" and Predicate Act Requirements

■ Given the impropriety of applying *Sedima* to this case, this Court turns to Hutton's argument that plaintiffs have not sufficiently alleged the predicate acts necessary to sustain a RICO claim. More specifically, the question posed is whether, within the accepted body of civil RICO law in this circuit, Count Eight states a proper RICO claim. Proper pleading of substantive RICO violations such as those charged by the plaintiffs requires the averment of an "enterprise" which affects interstate or foreign commerce, and the defendant's participation in the enterprise and in a "pat-

tern of racketeering activity." *United States v. Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528; *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir.1983). RICO claims must also satisfy the requirement of Fed.R.Civ.P. 9(b) that allegations of fraud be set forth with particularity. *Ralston v. Capper*, 569 F.Supp. at 1581; *Eaby v. Richmond*, 561 F.Supp. 131, 136 (E.D.Pa. 1983).

1. Existence of an Enterprise

 "Enterprise" as defined in 18 U.S.C. § 1961(4) "includes any individual, partnership, corporation, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity." Both legitimate business entities and completely illegal organizations can qualify as "enterprises" for RICO purposes. *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528; *United States v. Sutton*, 642 F.2d 1001 (6th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981). Under *Turkette*, the existence of such an enterprise must be established by "evidence that the various associates function as a continuing unit" for a common purpose. Moreover, the enterprise must be shown to have an existence "separate and apart from the pattern of activity in which it engaged." 452 U.S. at 583, 101 S.Ct. at 2528; *United States v. Sutton*, 700 F.2d 1078, 1082 (6th Cir.1983).

 Paragraph 95 simply alleges that, in addition to their *de facto* association for conducting security or commodity investments, "Hutton and Troyer ... were also associated in an enterprise established for the purpose of defrauding the Plaintiffs through commodity investments." Reading this allegation in conjunction with the allegations of fact in paragraphs 5–49, and accepting all the contentions as true, this Court nonetheless concludes that the plaintiffs fail to properly allege the existence of an enterprise under RICO. Even a liberal reading of the second amended complaint fails to reveal in what manner Hutton and Troyer allegedly constituted an "ongoing organization" in which "the various associ-

ates function as a continuing unit." And even if the relationship between a principal and an apparent agent was an "enterprise" with a "common purpose", the plaintiffs utterly fail "to show that the enterprise has an existence beyond that which is necessary merely to commit the alleged predicate racketeering offenses." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 567 F.Supp. 1146, 1153 (D.N.J.1983) (citing *United States v. Riccobene*, 709 F.2d 214 (3d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)). The second amended complaint fails to allege an enterprise separate and apart from the alleged predicate offenses. Rather, like the defective complaint in *Seville*, it "pleads the existence of an 'enterprise' which is apparently synonymous with the defendants' alleged 'pattern of racketeering activity.'" *Id.*

Although the Sixth Circuit's definitions of "enterprise" have been set forth in criminal cases, the views expressed there are consistent with the conclusion reached above. Particularly pertinent are the two *Sutton* cases, in which the court of appeals sustained a RICO conviction and the district court's subsequent denial of post-judgment and habeas corpus relief. Sutton was convicted of conducting an enterprise through a pattern of racketeering in violation of § 1962(c), of conspiracy to commit that offense under § 1962(d), and of various drug offenses. The court rejected his argument that a multi-person drug ring could not be a RICO enterprise. It noted that the participants

... operated the heroin conspiracy from their jewelry stores ... in *close and continual* partnership with Carl Sutton. [They] also used the jewelry store for fencing stolen jewelry, stolen firearms, stolen household goods, and the commission of mail fraud. The evidence shows and the jury could have found that they used the proceeds of these ancillary crimes to finance further purchases of heroin. *This was in fact an integrated "enterprise".*

700 F.2d at 1082 (quoting 642 F.2d at 1017–18). In sharp contrast, the plaintiffs here fail to allege any activities conducted by the Hutton-Troyer "enterprise" other than the predicate acts constituting the "pattern of racketeering activity."

### 2. Predicate Acts and Pleading Standards

Hutton also maintains that Count Eight must be dismissed because the pleading lacks proper allegations concerning the predicate acts themselves.

Under 18 U.S.C. § 1961(1) and (5), a "pattern of racketeering activity" involves at least two acts of "racketeering activity" within ten years. Acts of "racketeering activity" are indictable acts, and allegations concerning them should be viewed in light of the hornbook law that a federal grand jury should return an indictment only where there is probable cause or a reasonable probability that a crime has been committed. *United States v. Calandra,* 414 U.S. 338, 344, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). "Thus, to properly plead an action under the treble damages provision of RICO, a party must allege two acts of 'racketeering' with enough specificity to show there is probable cause the crimes were committed." *Bache Halsey Stuart Shields, Inc. v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042, 1045 (D.Utah 1983).

With respect to fraud in the sale of securities, this Court previously ruled that claims involving commodities trading could not be brought under the federal securities laws. In reaching this conclusion, it cited with approval a line of cases finding that Congress has determined that "the commodities account, whether or not discretionary, is not a security within the contemplation of the federal securities laws." Memorandum and Order at 9 (quoting *E.F. Hutton & Co. v. Schank,* 456 F.Supp. 507, 513–14 (D.Utah 1976)). Accordingly, Hutton could not have committed fraud in the sale of securities.

Turning to the allegations of federal mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, the elements of an indictable offense are: (1) a scheme designed to defraud or to obtain money or property by false pretenses; and (2) use of the mails or interstate wires (including interstate telephone calls) in furtherance of the fraudulent scheme. Specific intent to defraud must be pleaded and proved. *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Strong,* 702 F.2d 97 (6th Cir.1983) (mail fraud); *United States v. Morelli,* 643 F.2d 402 (6th Cir.), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (wire fraud and RICO). The plaintiffs need not allege that Hutton personally used the mails or interstate wires, nor need they establish that the use of mails or interstate wires was required for carrying out the scheme. *United States v. Strong,* 702 F.2d at 100.

Applying the standards set forth in the RICO and mail and wire fraud cases, this Court concludes that Count Eight fails to satisfy Fed.R.Civ.P. 9(b). The second amended complaint neither mentions the relevant criminal statutes—18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) —nor alleges facts which would provide probable cause for indicting Hutton for violating them. Moreover, the plaintiffs fail to allege a causal relationship between the alleged "pattern of racketeering activity" and the damage they allegedly sustained. Troyer's prior convictions, as incorporated into paragraph 49 of the second amended complaint, indicate that the plaintiffs' damages were caused by his grand theft and commodity fraud; nothing in Count Eight or elsewhere in the pleading refutes this inference or suggests an adequate link between Hutton's conduct and the injuries. Reading Count Eight as a whole, including the plaintiffs' questionable incorporation by reference of other portions of the complaint (a disfavored practice in RICO cases), this Court must conclude that the pleading is fatally deficient.

Count Eight is dismissed.

### IV. STATE LAW CLAIMS

What remains of this case are Counts Nine and Ten, which arise under Ohio law.

The thirty-five plaintiffs are all from Ohio and Hutton is a New York corporation. Of the twenty-four claims against Hutton, only six are for more than $10,000 in compensatory damages, but the plaintiffs collectively seek $500,000 in punitive damages. The question is whether the punitive damage claim permits this Court to exercise diversity jurisdiction over all of the plaintiffs.[4]

■ As discussed in the Memorandum and Order at 12–13, the general rule is that the amount claimed by a plaintiff in good faith controls unless it appears to a legal certainty that the claim is for less than the jurisdictional amount or unless the amount claimed is merely colorable. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). A claim for punitive damages, if permitted under governing law, can be included in determining whether the amount in controversy has been met. *Bell v. Preferred Life Assurance Society*, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943). Addressing this issue in *Sellers v. O'Connell*, 701 F.2d 575 (6th Cir.1983), the court of appeals stated:

> ... A punitive damage claim must be included unless such damages are barred by the applicable state law. *Wood [v. Stark Tri-County Building Trades Council*, 473 F.2d 272, 274 (6th Cir. 1973) ] ... District of Columbia law controls this case.... That law generally disfavors punitive damages.... Since appellant has cited no cases in which the District of Columbia courts have granted punitive damages against a trustee on facts similar to those in the present case, we refuse to include the claim for such damages in calculating the amount in controversy.

*Id.* at 579.

Count Nine alleges that Hutton is liable to the plaintiffs for all of Troyer's activities under the doctrine of *respondeat superior*

as incorporated into the Ohio law of agency. Count Ten states that Troyer and Hutton's conduct constitutes fraud under the law of Ohio, and that Hutton is directly and vicariously liable for the damages which plaintiffs sustained because of the fraud.

■ In Ohio, as a general rule, punitive damages are disfavored in law and are awarded only where willful or wanton conduct by the defendant or the need for a deterrent compels their imposition. *See Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352 (6th Cir.1978); *Marr v. Rife*, 503 F.2d 735 (6th Cir.1974); *cf. Moran v. Johns-Mansville Sales Corp.*, 691 F.2d 811 (6th Cir.1982). It is also true that in Ohio punitive damages are available in a fraud action "only where the operative fraud is aggravated, as where the perpetrator's actions are malicious, gross or wanton." *Miles v. Perpetual Savings & Loan Company*, 58 Ohio St.2d 93, 388 N.E.2d 1364, 1366 (1979) (per curiam); *Logsdon v. Graham Ford Co.*, 54 Ohio St.2d 336, 376 N.E.2d 1333 (1978) (per curiam). Nonetheless, it cannot be said as a matter of law that Ohio law prohibits punitive damages in a fraud action. Regardless of the plaintiffs' chances of actually recovering punitive damages, it would be error to hold that such damages are "barred by the applicable state law."

Accordingly, all plaintiffs satisfy the $10,000 jurisdictional requirement under 28 U.S.C. § 1332(a)(1).

## V. CONCLUSION

■ In conclusion, all claims under the CEA and RICO (Counts One through Eight) are dismissed; the motion to dismiss the claims of plaintiffs who seek less than $10,000 in compensatory damages in Counts Nine and Ten is denied.

Since the preceding analysis has narrowed the issues for trial, but leaves the plaintiffs with the opportunity to try the

---

**4.** Title 28 U.S.C. § 1332 provides in part:
 (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of

$10,000, exclusive of interest and costs, and is between—
 (1) citizens of different States ...

state law claims of Counts Nine and Ten to a jury, a final pretrial conference, which will include settlement discussions, is scheduled for Friday, December 21, 1984 at 11:30 a.m. The parties are ordered to submit supplemental final pretrial briefs and a detailed stipulation of facts to this Court by Friday, December 14, 1984.

IT IS SO ORDERED.